IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

TOMMY O'BRYANT                                                                    PLAINTIFF

VERSUS                                                      CAUSE NO. 1:18-cv-00008-HSO-JCG

WALGREEN, CO., CBRE GROUP, INC.,
AND JOHN OR JANE DOES 1-10                                                       DEFENDANTS

**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT
CBRE GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT**

Comes Now defendant CBRE Group, Inc., and files this its Memorandum Brief in Support of its Motion for Summary Judgment and would show unto the Court the following, to-wit:

## I. INTRODUCTION

This action arises as a result of injuries received by plaintiff Tommy O'Bryant (hereinafter "O'Bryant") on February 27, 2015. On that date O'Bryant was standing on the sidewalk of the Walgreens location at the intersection of Popps Ferry Road and Pass Road in Biloxi, Mississippi. O'Bryant was standing in the area on the east side of the store's entrance, near a garbage can smoking a cigarette and talking with his brother-in-law. (Exhibit "C" pp 50 - 51) At the same time, a Dodge pickup truck driven by Edward Kersh pulled into the parking spot directly in front of O'Bryant. *Id.* For reasons unknown, Edward Kersh's foot appears to have slipped off the brake pedal and onto the accelerator causing the pickup to lurch onto the sidewalk. As a result, O'Bryant was struck by the truck and pinned between the truck and the wall of the store. O'Bryant suffered serious injuries as a result of the accident.

As this Court is most likely aware, Walgreens operates retail pharmacy locations throughout the United States and abroad. At the time of the subject accident Walgreens operated approximately 8,000 locations in the United States alone.

At the time of the above described incident, CBRE provided certain services to Walgreens pursuant to a Facilities Management Outsourcing Agreement ("FMOSA"). The FMOSA is described in additional detail below. Generally, though, the services provided by CBRE included general light carpentry, light plumbing and heating, ventilation and air conditioning ("HVAC") at the subject location. CBRE also provided call center and dispatch services to Walgreens on a national level wherein Walgreens would create a work order request and CBRE would then dispatch the appropriate third party vendor to perform the work. The third-party vendors were approved by and contracted directly with Walgreens.

It is undisputed that CBRE did not own, operate, manage or control the subject Walgreens. Walgreens does not dispute that the premises was controlled by Walgreens. (See affidavits of Gary Ballenger (Exhibit "A") of CBRE and Richard Schmidt of Walgreens (Exhibit "B").

In his Complaint Plaintiff alleged that Walgreens and CBRE are liable to him under premises liability and general negligence law theories. Plaintiff has alleged that both Walgreens and CBRE were negligent by among other things: (1) failing to keep the premises in a reasonably safe condition and failing to warn the plaintiff of dangerous conditions which were not readily apparent (2) by failing to make the premises reasonably safe by (a) creating and maintaining nose-in parking near the sidewalks and entry ways (b) having secondary uses of the sidewalk 8-10 feet from the nose-in parking spots (c) by placing inadequate safety barriers between nose-in parking and the sidewalk (d) negligently placing, providing, creating and maintaining safety barriers throughout the parking areas. Plaintiff has further alleged that both CBRE and Walgreens were grossly negligent due to their knowledge of the inadequacy of the safety measures taken in regard to the sidewalks and parking areas. The plaintiff further alleged negligent infliction of emotional distress. (Docket#1)

Notably, Plaintiff made no effort to differentiate his allegations between Walgreens, who was unquestionably in control of the premises, and CBRE who was not. As a result, CBRE requested clarification from the Plaintiff through written discovery as to the specific facts supporting the claims against CBRE. Plaintiff objected to providing a response to the subject inquiries. As result, CBRE was forced to file a Motion to Compel. Plaintiff was subsequently compelled to provide the factual basis for his allegations against CBRE. In response Plaintiff essentially cherry-picked and misinterpreted a handful of phrases from a 600 plus page contract and stated that CBRE somehow owed him a duty because of its contract with Walgreens. (Exhibit "D")

In essence Plaintiff is alleging that bollards or some other form of safety device should have been placed on or in front of the sidewalk to prevent Kersh's vehicle from jumping the curb and injuring the plaintiff. As will be discussed CBRE owed no duty to the Plaintiff and had no authority to do anything affirmatively to make the parking lot safer as alleged by the Plaintiff.

## II.  LAW AND ARGUMENT

### A.  Summary Judgment Standard

The Federal Rules of Civil Procedure authorize the granting of summary judgment where there are no genuine issues of material fact as set forth in pertinent part in Rule 56©, as follows:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone, although there is a genuine issue as to the amount of damages.

Fed. R. Civ. P. 56(c).

A party seeking summary judgement must establish the absence of a genuine issue of material fact by providing the court with the basis of its motion and identifying the portions of the record in the case in support of its contention. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; 106 S. Ct. 2548; 91 L. Ed. 2d 265 (1986). "Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Templet v. Hydrochem Inc.*, 367 F.3d 473, 477 (5th Cir. 2004).

There are no disputed issues of material fact which preclude this Court from granting the instant motion. An application of the law to the undisputed facts shows that CBRE is entitled to dismissal of all claims against it.

**B.     Plaintiff's Premises Liability Claims Fail as a Matter of Law**

As discussed above, Plaintiff has alleged first and foremost that CBRE is liable to him under a premises liability theory. These allegations fail as a matter of basic premises liability law. In order to prove a premises liability claim under Mississippi law, the Plaintiff must, as a threshold matter, establish the defendant was the "owner, occupant or person in charge of a premises." *Anderson v. B.H. Acquisition, Inc.*, 771 So.2d 914, 918 (Miss. 2000). In the instant matter, the Plaintiff cannot show that CBRE falls into any of the aforementioned categories.

CBRE was not the owner or lessee of the subject premises, as there is no dispute that Walgreens was the lessee of the premises. Further, there is no dispute that Walgreens operates a retail pharmacy outlet at the location. There is nothing to suggest that CBRE occupied the premises as CBRE did not maintain a presence at the location, and there is no evidence indicating any CBRE personnel were even present at the location at the time of the subject incident. In his deposition, the

Plaintiff admitted that he had not spoken to anyone from CBRE, didn't know anything about CBRE and did not even know why he had sued CBRE. (Exhibit "C" p.92)

Perhaps the most important undisputed fact is that CBRE did not own, manage or otherwise control the parking lot or sidewalk at the subject location. Walgreens has stated unequivocally through the Affidavit of Richard Schmidt its Director of Legal, Commercial Law (Exhibit "B") that CBRE did not own, manage or otherwise control the parking lot at the subject Walgreens at the time of the subject incident. The affidavit of Mr. Schmidt further states that CBRE had no responsibilities for design or construction of the subject parking lot. Further, Schmidt states that CBRE did not have responsibilities or a decision making role related to the installation of bollards or other safety devices on the sidewalk where Plaintiff was injured. *Id.*

Under the applicable standard for a premises liability claim, there is no dispute that CBRE lacked control, ownership or occupancy of the sidewalk and parking lot where plaintiff was injured. Accordingly, the premises liability claims against CBRE fail as a matter of law and should be dismissed with prejudice.

C.   **Plaintiff's Negligence Claims Against CBRE fail as a matter of law**

In addition to the premises liability claim, Plaintiff has also alleged generally that CBRE was negligent and that this negligence was the proximate cause of his injuries. Importantly, Plaintiff has failed to explain precisely how CBRE was negligent. As previously indicated, Plaintiff has asserted that CBRE owed a duty to him because CBRE was under a contractual relationship with Walgreens which required CBRE to maintain pavement and outdoor structures at the subject location. Plaintiff has further alleged that CBRE had a duty to "recommend improvements, identify best practices, and

- 5 -

propose methods to Walgreens to result in cost savings or enhance customer service". (See Exhibit "D" Plaintiff's Supplemental Answers To First Set of Interrogatories). Plaintiff has not made a breach of contract claim, though his argument appears to be that CBRE's contract with Walgreens somehow created a duty to Plaintiff. A fair reading of the portions of the agreement between Walgreens and CBRE defeats Plaintiff's assertions. Regardless, Plaintiff's theory is one of negligence and the claims must be analyzed under a traditional negligence analysis.

At the outset in order to succeed on a negligence claim, the Plaintiff must prove duty, breach of that duty and causation. "The elements of negligence are well-established: duty or standard of care, breach of that duty or standard, proximate causation, and damages or injury. *Porter v. Grand Casino of Miss. Inc.*, 181 So.3d 980, 985 (Miss. 2016). As will be shown, Plaintiff's claims fail under such an analysis.

Plaintiff has failed to allege any duty CBRE owed to him. While the plaintiff's allegations attempt to make a claim that CBRE has somehow breached a contractual duty to Walgreens, CBRE had no contractual duty to Plaintiff. Further, the precise terms of the contract do not state what the Plaintiff has alleged in his supplemental interrogatory answers and perhaps most importantly, Walgreens has not made any claims against CBRE related to this incident. To be clear, the contract does not give CBRE control over the sidewalks or parking lots of any Walgreens facilities including the one located on Popps Ferry Road in Biloxi, Mississippi where the accident occurred.

Plaintiff's Interrogatory responses indicate that he believes CBRE had control over the sidewalk sufficient to impart liability upon CBRE. This belief is due to his misinterpretation of the Facilities Management Outsourcing Agreement ("FMOSA"). (Exhibit "E") Plaintiff has cited to

Sections 4.1, 4.2 and 17.12 of the FMOSA as well as Annex 18 parts 2 and 5 in support of his allegation of negligence by CBRE. While Plaintiff has not alleged, and actually lacks standing to allege a breach of contract claim, an understanding of the referenced portions of the FMOSA are essential to an analysis of Plaintiff's claims.

As the Court can surely understand, the FMOSA is a lengthy and complex document consisting of 634 pages intended to address numerous portions of the relationship between Walgreens, a retailer operating over 8,000 locations in the United States and abroad and CBRE. It is also important to note that the FMOSA has been amended on three occasions.

### D. Second Amendment to FMOSA removed all exterior responsibilities from CBRE

The Second Amendment to the FMOSA saw CBRE relinquish many of its services to Walgreens in exchange for reduced compensation. The Second Amendment was in effect at the time of the subject incident. As a result of the Second Amendment (Exhibit "F") CBRE no longer had duties to perform any work to the area on the exterior of Walgreens' locations. As discussed in the affidavit of Gary Ballenger (Exhibit "B") at the time of the subject incident CBRE had responsibilities to perform HVAC, light carpentry and plumbing work when requested by Walgreens. CBRE had no responsibilities or input as to whether or not bollards or other safety devices were installed. *Id.* And further, CBRE had no responsibilities whatsoever for the area where Plaintiff was injured. *Id.*

Obviously, if CBRE had no contractual duties in relation to the sidewalk or exterior of the building it could not have owed the plaintiff a duty of any kind. Quite plainly the analysis of CBRE's liability should end at this point. CBRE was not in control of the sidewalk. CBRE did not own or

mange the sidewalk. And, at the time of the incident did not even have responsibilities to perform services of any kind in regard to the sidewalk.

### E.  Even if Second Amendment does not apply CBRE still does not owe Plaintiff a duty in regard to the sidewalk

Assuming *arguendo*, that the Second Amendment was not in effect at the time of the incident, even the initial FMOSA (Exhibit "E") did not impart control over sidewalks to CBRE as the duties on the exterior of the store were largely limited to repairs to existing structures.

The actual FMOSA is comprised of 17 sections, all of which contain multiple subsections. Many portions of the FMOSA then refer to one of 21 annexes which further define the terms of the agreement. There are additionally other exhibits, supplements and amendments.

As noted, Plaintiff has chosen to emphasize a limited number of items from the FMOSA and its Annexes which he alleges support his negligence claims.

#### 1)  FMOSA Section 4.1 Defines Scope of Services

Plaintiff correctly notes that the scope of services to be provided by CBRE are generally discussed in Section 4.1 of the FMOSA which then refers to Annex 18 (Exhibit "G") for a detailed description of the services to be performed. Plaintiff relies on Annex Sections 18.2 and 18.5 to state that CBRE owes him a duty.

#### 2)  Annex 18 Does Not Create A Duty to Plaintiff

Section 2.0 of Annex 18 is entitled "Building Services & Maintenance". Importantly, nothing in this section of the FMOSA discusses responsibilities of CBRE as they pertain to sidewalks - the precise area where plaintiff was injured. Illustrative of this point is subsection 2.1 which provides the following:

    **2.1**    **Building Structure, Structural and Surface including, but not limited to; Glass, Roofing, Doors, Fixtures, Signs, Banners, Awnings, Pharmacy Drive-Thru, Interior and Exterior Painting**

**DEFINITIONS:**

| | |
|---|---|
| **Structure:** | all non-structural building elements either interior or exterior |
| **Structural:** | all building elements that provide primary or secondary building support of the shell and core. |
| **Shell & Core:** | the "Building Envelope" and the elements and systems that comprise common restrooms, elevators and elevator lobbies, stairways and other dedicated support spaces adjacent to these elements and systems (e.g. janitor's closets, electrical rooms). |
| **Building Envelope:** | all building elements and systems that comprise the exterior of the building (generally include the roof exterior walls, and exterior windows and doors)." |

A review of the remainder of Section 2.0 et seq., discusses duties for CBRE as they pertain to numerous specific items. Among these are glass repairs, doors, windows, skylights, curtain walls, parking garages, exterior structural elements, signs, banners, awnings, building roofs, parapets and drainage, window and door frame seals, entryways, stairs, ramps, fire escapes and ladders, foundations, pharmacy drive-thru and locking systems. Also discussed in the section are CBRE's responsibilities for painting the aforementioned items. However, a careful review of the entire section of the Annex fails to reveal any mention whatsoever of sidewalks or parking lots other than garages. Plaintiff was not injured as a result of failure of CBRE (or Walgreens) to maintain any of the foregoing items.

Further analyzing Plaintiff's assertions regarding the FMOSA requires analysis of Annex 18 section 5. Section 5 is entitled "Grounds Maintenance". The relevant portions of Section 5 state as follows:

**5.2 Pavements and Outdoor Structures**

**5.2.1 Pavements**
Assets included in the Services:
• Footpaths, trails and sidewalks
• Driveways, private roadways, and docks
• Outdoor paved stairways and ramps
• *Parking lots*
Indoor and outdoor parking garages  Drive-through lanes
• *Cement barriers* • Repainting and restriping of parking areas
• Hardscapes (*Emphasis added*)
Outcomes. Walgreen's required outcomes are:
• Active pavements kept clear of obstructions, hazardous conditions or standing water
• Pavement markings are clearly visible
Maintain cement pavements. Service Provider shall:
– Patch or fill holes and cracks as appropriate to Service Levels.
– Repave or re-lay individual sidewalk slabs, curbs or small areas of fitted pavement whose condition presents a safety hazard to users.
– Remove vegetation from between cracks in pavements
– Remove oil leaks and stains as appropriate to Service Levels.
– Maintain drainage systems.

Maintain blacktop pavements. Service Provider shall:
– Patch or fill holes and cracks as appropriate to Service Levels.
– Remove vegetation from between cracks in pavements
– Remove oil leaks and stains as appropriate to Service Levels.
– *Lay and paint asphalt speed bumps when requested by Walgreen.*
*Service Provider shall maintain paintwork on pavements and barriers (Parking Lot Striping).* (*Emphasis added*)
– Touch up faded pavement markings, striping and stencils.
– Touch up flaked or scarred paintwork as appropriate to Service Levels.

Service Provider shall clean parking lot
– Parking Lot Sweeping:
– Performing mechanical sweeping and collection of resulting debris.
Includes; parking lots, driveways, docks/truck wells, and other vehicle access areas as applicable.
– Collect and remove trash/debris resulting from sweeping from the premises.

**5.2.2 Outdoor structures**
Assets included in the Services:
• Fences, gates, walls and railings • Parking garages.
• Painted and illuminated signs • Flagpoles, lamp posts and signposts

- 10 -

• Painted and illuminated signs • Flagpoles, lamp posts and signposts
• Storage sheds and shelters • Attendant booths and related infrastructure
• Outdoor and rooftop enclosures • Outdoor furniture, trash cans and ash cans

Outcomes. Walgreen's required outcomes are:
• Outdoor structures kept clear of obstructions and hazardous conditions
• Signs are fully functional and bright.
• Fences, barriers, gates and enclosures are secure.

5.2.2.1 Maintain parking garage. Service Provider shall:
– Maintain all structural elements, including drainage.
– Maintain and repair garage infrastructure such as lighting, elevators, controls and alarms, attendant booths and access control Equipment.
– Ensure proper drainage.
– Maintain gates, doors and locks, including roll-down doors.

5.2.2.2 Maintain outdoor signs. Service Provider shall:
– Touch up or repair any damage to signs as appropriate to Service Levels.
– Maintain and repair associated lighting, digital displays and moving parts.
– Hang and remove banners, signs and posters for events.

5.2.2.3 Maintain fences, sheds and enclosures.
– Service Provider shall repair gaps or breaks.

5.2.2.4 Maintain and repair outdoor assets. Service Provider shall:
– Maintain and repair outdoor assets as appropriate to Service Levels
– Remove or paint over graffiti. Replace small assets that are damaged such as signs, bins and benches.

As can be seen, when CBRE initially had responsibilities related to parking lots and sidewalks, those duties were limited. (Again at the time of the Plaintiff's injuries the outside maintenance obligations had been taken out of the contract based upon the undisputed facts before the Court. Exhibit "A"). Regardless, even under Plaintiff's assertions regarding the contract, CBRE only had a duty to *maintain* items by *repairing* or repainting when conditions dictate. Nothing in the section of the FMOSA (Exhibit "E") required CBRE to construct new barriers, recommend new barriers be constructed or to design the sidewalk or parking lots. Simply put, CBRE only had a duty

to make repairs as requested by Walgreens. CBRE has no duty or authority to make safety decisions associated with how the parking lots were designed. Nothing in the aforementioned portions of the FMOSA created a duty on the part of CBRE to the Plaintiff which are relevant to the claims in this action.

### 3) Section 4.2 of FMOSA Does Not Require CBRE to Make Recommendations Regarding Facility Construction

Plaintiff next attempts to argue that section 4.2 of the FMOSA (Exhibit "E") creates a duty by CBRE "to recommend improvements, identify best practices, and propose methods to result in cost savings or enhance customer service." (Exhibit "D") As can be seen from the terms imposed by section 4.2, Plaintiff's assertions represent a clear misunderstanding of the contract terms:

**4.2 Service Evolution and Improvements.**

(a) Evolution of Services. It is anticipated that the Services will evolve and be supplemented, modified, enhanced or replaced over time to keep pace with advancements and improvements in the methods of delivering Services. These changes will modify the "Services" and will not be deemed to result in New Services unless the changed Services are materially different from and materially in addition to those then being provided by Service Provider and such changes satisfy the definition of New Services under Section 4.11.

(b) Obligation to Improve. Service Provider acknowledges that current technologies and processes employed throughout Walgreen will continue to evolve and change over time, and at a minimum, remain consistent with Walgreen's business objectives and competitive needs. Service Provider will introduce and recommend Service Improvements to improve the provision of the Services and to ensure that it keeps pace with advancements or improvements in the marketplace consistent with industry best practices during the Term.

(c) Monitoring Trends and Technology and Process Audit. Walgreen may elect to conduct periodic audits, at Walgreen's discretion, to benchmark Service Provider against industry best practices. If any such audit reveals that the technology or processes are not at the level of industry best practice, then, at Walgreen's request, Walgreen and Service Provider will review the results of the audit and establish and implement a plan to introduce any identified industry best practices.

(d) New Operational Processes. If Service Provider develops, implements, offers or uses operational process advances or changes to any Service Provider Systems used

to provide services to other Service Provider customers that are the same or substantially similar to the Services, or Service Provider develops, implements, offers or uses new or enhanced services, tools, products or processes that it will offer to such customers (collectively, "New Systems"), Service Provider will (I) offer Walgreen the opportunity to serve as a pilot customer in connection with the implementation of such New Systems; and (ii) even if Walgreen declines this pilot customer opportunity, offer Walgreen preferred access to such New Systems and the opportunity to be among the first of Service Provider customer base to implement and receive the benefits of any New Systems.

(e) Obligation to Propose. Service Provider will identify and propose the implementation of any technology or process identified by Service Provider in the ordinary course of its business that is likely to:

    (1) improve the efficiency and effectiveness of the Services (including cost savings);
    (2) result in cost savings or revenue increases to Walgreen in areas of its business outside the Services;
    (3) enhance Walgreen's ability to conduct its business and service its customers; and
    (4) achieve Walgreen's objectives, set out in this Agreement, faster or more efficiently than the then-current strategies."

While it is true that the FMOSA requires CBRE to make recommendations to Walgreens, it is clear that the "recommendations" are related to practices, strategy and technologies that result in cost savings or efficiencies for Walgreens. A fair reading of Section 4.2 does not support the assertion that CBRE had a duty to recommend physical plant changes, such as the installation of bollards along a sidewalk, to Walgreens. Such an argument by Plaintiff's counsel blatantly mischaracterizes the unmistakable intent of the FMOSA in Section 4.2. Furthermore, even if Plaintiff's assertions are true, there is clearly a distinction between a recommendation to a customer to do something compared to actual authority to make safety decisions and unilaterally implement the same. Even under Plaintiff's theory, CBRE had no authority to make a decision as to how Walgreens should manage its parking lot. Again CBRE simply had no control over the premises.

### 4)   FMOSA Section 17.12 Does Not Impart Control Over Sidewalk to CBRE

Finally, Plaintiff relies - once again on a misinterpretation - of Section 17.12 of the FMOSA to support the idea that CBRE had control over the sidewalk.

> Section 17.12 states: 17.12 Relationship of the Parties. Service Provider, in furnishing services to Walgreen hereunder, is acting as an independent contractor, and Service Provider has the sole obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by Service Provider under this Agreement. The relationship of the Parties under this Agreement shall not constitute a partnership or joint venture for any purpose. Service Provider shall be Walgreen's sole point of contact regarding the Services. Service Provider is not an agent of Walgreen and has no right, power or authority, expressly or impliedly, to represent or bind Walgreen as to any matters, except as expressly authorized in this Agreement. Walgreen is not an agent of Service Provider and has no right, power or authority, expressly or impliedly, to represent or bind Service Provider as to any matters, except as expressly authorized in this Agreement.

The referenced section of the FMOSA does not create additional duties for CBRE. This section merely indicates that CBRE is responsible for the services it provides under the FMOSA. In short, CBRE and its employees are not Walgreens' employees or agents and are expected to operate as an independent contractor to Walgreens. This section does not somehow place CBRE in control of the sidewalk as Plaintiff would have the Court believe.

Accordingly, any failures, if any, associated with CBRE's maintenance of the parking lot, i.e. painting or patching areas of the sidewalk and parking lot were not the proximate cause of any injuries to Plaintiff. Such alleged obligations under the contract have nothing to do with whether bollards were placed near the sidewalk where the Plaintiff was standing which is the heart of Plaintiff's liability theory. Given that the FMOSA specifies the responsibilities of CBRE as to parking lots and sidewalks, plaintiff's claims of negligence based on the contract should be dismissed.

## CONCLUSION

Based on all of the aforementioned, Plaintiff has failed to show that CBRE owed him any duty whatsoever because CBRE did not own, manage or control the subject premises. Furthermore, Plaintiff's claim that CBRE somehow breached its contract with Walgreens creates questions of fact as to CBRE's liability also fails. First, pursuant to the undisputed facts CBRE had no obligations associated with the parking lot at the time of the accident. Alternatively, even if the FMOSA gave CBRE certain maintenance obligations such as painting or cleaning, the contract gave CBRE no actual authority to make safety decisions, specifically the authority to put bollards in the parking lot.

WHEREFORE ABOVE PREMISES CONSIDERED, defendant CBRE Group, Inc., respectfully requests this Court grant its Motion for Summary Judgment and dismiss the claims against it with prejudice. CBRE further requests any other relief to which it is entitled in the premises.

RESPECTFULLY SUBMITTED, this the  2nd  day of October, 2018.

**CBRE GROUP, INC., DEFENDANT**

BY:    S\ *Edward C. Taylor*
           OF COUNSEL

## CERTIFICATE OF SERVICE

I, the undersigned counsel, of counsel for Defendant, CBRE Group, Inc., do hereby certify that on this day, I served a true and correct copy of the above and foregoing *Memorandum Brief in Support of Defendant CBRE Group, Inc.'s Motion for Summary Judgment* to the following:

| | |
|---|---|
| Douglas L. Tynes, Jr., Esq. | Patrick R. Buchanan, Esq. |
| Courtney Wilson, Esq. | Brown Buchanan, PA |
| Tynes Law Firm, P.A. | P.O. Box 1377 |
| P.O. Drawer 966 | Biloxi, MS 39533-1377 |
| Pascagoula, MS 39568-0966 | *mailb@brownbuchanan.com* |
| *monte@tyneslawfirm.com* | |
| *courtney@tyneslawfirm.com* | |

THIS, the  2nd   day of October, 2018.

S\ *Edward C. Taylor*
OF COUNSEL

EDWARD C. TAYLOR - MS BAR #9043
etaylor@danielcoker.com
CHRISTOPHER H. MURRAY - MS BAR #102779
cmurray@danielcoker.com
DANIEL COKER HORTON AND BELL, P.A.
1712 15TH STREET, SUITE 400
POST OFFICE BOX 416
GULFPORT, MS 39502-0416
TELEPHONE:  (228) 864-8117
FACSIMILE:   (228) 864-6331
4217-134412